OPINION
(¶ 1} This matter is before the Court on the Notice of Appeal of William R. Givens, filed July 27, 2006. On April 11, 2006, Givens was indicted on one count of kidnaping, in violation of R.C. 2905.01(A)(1), one count of abduction, in violation of R.C. 2905.02(A)(2), one count of attempted kidnaping, in violation of R.C. 2923.02 and 2905.01(A)(1), and one count of attempted *Page 2 
abduction, in violation of R.C. 2923.02 and 2905.02(A)(2). The victim named in the first two counts was Barbara Givens, William's mother, and the victim named in the third and fourth counts was Mindy Jordan, William's girlfriend. Following a trial to a jury, Givens was found guilty of kidnaping and abduction and not guilty of the remaining charges. The State selected to proceed under count one for sentencing and the trial court sentenced Givens to eight years in prison.
 {¶ 2} The events giving rise to this matter began on April 4, 2006, when Givens' brother, James Givens, placed a 911 call from his mother Barbara's home, reporting that William was fighting with Mindy outside in an alley. James told the 911 operator, "My mother said he's got a knife, got her in front of him." When the 911 operator instructed James to "keep giving me what's going on," James stated, "I'm not outside seeing what's going on. I tried to come inside. I'm trying — I been trying to stay away from him." James testified that he did not actually see William and Mindy in an altercation, and that he did not see a knife.
 {¶ 3} When the police responded, William fled on foot. Barbara and James got in Barbara's car to search for William. When they found him, Barbara exited the car and within minutes several officers surrounded William. William then grabbed Barbara and held the knife to her throat. The officers drew their weapons, and they ordered William to let Barbara go and to put the knife down. One officer pulled Barbara from William's grasp, and William put the knife down on Barbara's car.
 {¶ 4} At trial, the following witnesses testified: Frank Orr, the Communications Manager for the City of Springfield, testified regarding the process of recording 911calls and stated that he was the custodian of the tape at issue, and that it was made in the ordinary course of his occupation; James Givens; Keith Hopper, a patrol supervisor for the Clark County Police Department, testified that he responded to the scene and observed William with a knife; Jerome Klark, an officer with the *Page 3 
Springfield Police Division, testified that he responded to the scene and observed William running with a knife before he was apprehended; Doug Pergram, another Springfield Police officer, testified that he responded to the scene, and that William grabbed Barbara and "was behind her with her in front of him, and he had his arm around her and held the knife to her neck," and that Pergram pointed his rifle at William; Robert Tate, a sergeant with the Springfield Police Department, testified that he responded to the scene, that William "grabbed the female, pulled her towards him, had his left arm around her chest and the knife was in his right hand. He had it directed at her," and that Tate then grabbed Barbara by her left arm and pulled her from William; David Emmel, another Springfield Police officer, testified that he responded to the scene and that "Mr. Givens ran around to the back of the vehicle where the female had gone, went around behind her, put his left arm around her chest and brought the knife up to her throat"; Roger Jenkins, another Springfield Police officer, testified that he responded to the scene and that William grabbed Barbara and "he had one hand around holding her kind of like he was trying to shield from us. He had a knife up to her throat"; finally, Barbara testified that William never held a knife to her throat, and that, when she found him in the alley, "when he came around my car, I grabbed him around the waist to stop him because I didn't want him running — I didn't want anyone hurting my son."
 {¶ 5} William asserts four assignments of error. William's first assignment of error is as follows: "THE PROSECUTOR'S INAPPROPRIATE COMMENTS DURING THE STATE'S CLOSING ARGUMENT EQUATES TO PROSECUTORIAL MISCONDUCT"
 {¶ 6} "The prosecution is normally entitled to a certain degree of latitude in its concluding remarks. (Citations omitted). A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones. (Citation omitted). The prosecutor is a servant of *Page 4 
the law whose interest in a prosecution is not merely to emerge victorious but to see that justice shall be done. It is a prosecutor's duty in closing arguments to avoid efforts to obtain a conviction by going beyond the evidence which is before the jury. (Citation omitted).
 {¶ 7} "It is not prosecutorial misconduct to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization. (Internal citations omitted). However, prosecutors may not invade the realm of the jury by, for example, stating their personal beliefs regarding guilt and credibility, or alluding to matters outside the record." (Internal citation omitted). State v. Baker, Greene App. No. 2004 CA 29, 2005-Ohio-45.
 {¶ 8} "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. (Citations omitted). To begin with, the prosecution must avoid insinuations and assertions which are calculated to mislead the jury. (Citation omitted). It is improper for an attorney to express his personal belief or opinion as to the credibility of a witness or as to the guilt of the accused. (Citations omitted). Moreover, the code [of Professional Responsibility] provides that an attorney is not to allude to matters which will not be supported by admissible evidence, DR 7-106(C)(1)." State v. Smith,14 Ohio St.3d 13, 470 N.E.2d 883.
 {¶ 9} "`The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.' (Citations omitted). When an appellate court reviews allegations of prosecutorial misconduct, it reviews the alleged misconduct in the context of the entire trial. (Citation omitted). A defendant's conviction will not be reversed when it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even absent the prosecutor's comments. Furthermore, failure to object to the alleged wrongful conduct waives all but plain error for the purposes of appellate *Page 5 
review. (Citation omitted). In order to find plain error, the reviewing court must find that `but for the error, the outcome of the trial clearly would have been otherwise.'" State v. Gay, Montgomery App. No. 21581, 2007-Ohio-2420.
 {¶ 10} William objects to certain remarks the prosecutor made during his closing argument regarding Barbara's credibility. The prosecutor stated, without objection: "Now, Barbara Givens, am I calling her a liar? I don't want to. It's a mother of a child. I understand that completely. Do I think she's being honest with you? No. She may not be being honest with herself, but she's definitely not being honest with you.
 {¶ 11} "Those officer's credibility is at question here, and I would submit to you that every one of those officers told you exactly what they saw; and what they saw meets the elements of these two crimes against Mindy Jordan and against Barbara Givens. * * * Their credibility should not be at stake. * * * and we specifically ask you in jury selection if you can put aside the fact that a mother may testify for her son because she loved him * * * ."
 {¶ 12} We agree with William that the prosecutor exceeded the normal latitude allowed in closing argument when he stated his personal belief that Barbara was not being honest, thereby invading the realm of the jury. We do not, however, believe that the error prejudicially affected William's substantial rights. In the context of the entire trial, it is clear beyond a reasonable doubt that the jury would have found William guilty in the absence of the prosecutor's opinion; several responding officers testified that they witnessed William grab Barbara and place the knife to her throat. There being no plain error, William's first assignment of error is overruled.
 {¶ 13} Williams' second assignment of error is as follows: "THE ADMISSION OF THE 911 TAPE CONSTITUTES PLAIN ERROR. *Page 6 
 {¶ 14} "A. The use of the 911 tape violates Ohio Rule of Evidence 803(2).
 {¶ 15} "B. The use of the 911 tape violates Ohio Rule of Evidence 403."
 {¶ 16} William did not object to the admission of the 911 tape. "Counsel's failure to object `constitutes a waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly could have been otherwise.'" State v. Boykin, Montgomery App. No. 19896, 2004-Ohio-1701. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Crim.R.52(B).
 {¶ 17} The tape was presented as substantive evidence of what occurred prior to the time the police arrived. William argues that the tape is inadmissible pursuant to Evid. R. 803(2) because James lacked firsthand knowledge of the events he reported that were occurring in the alley. He further argues that, pursuant to Evid. R. 403(A), its exclusion was mandatory since its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The state argues that the tape is admissible as an excited utterance, and as a present sense impression, and as a record of regularly conducted activity, pursuant to Evid. R. 803.
 {¶ 18} Any error in admitting the tape, however, is harmless; both James and Barbara were subject to cross-examination regarding its contents. More importantly, the statements on the tape were introduced to establish William's conduct as to Mindy, and William was found not guilty of the charges relating to her. In other words, William's substantial rights were not affected by the admission of the tape. There being no plain error, William's second assignment of error is overruled.
 {¶ 19} William's third assignment of error is as follows: "ROSS (sic) WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF *Page 7 
THE OHIO CONSTITUTION."
 {¶ 20} In determining whether a defendant has received the effective assistance of trial counsel, we apply the standards set forth inStrickland v. Washington (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id., at 686. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." Id., at 687.
 {¶ 21} "The Ohio Supreme Court has enunciated a similar test for determining claims for ineffective assistance of counsel:
 {¶ 22} 2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (Internal citations omitted).
 {¶ 23} 3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. (Internal citations omitted). *Page 8 
 {¶ 24} "In Strickland, supra, the Supreme Court instructed:
 {¶ 25} "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (Internal citations omitted). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' (Internal citations omitted). There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. (Internal citations omitted).
 {¶ 26} "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.
 {¶ 27} "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness *Page 9 
of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. Strickland, supra, at 689-690."State v. Lloyd (March 31, 1999), Montgomery App. No. 15927.
 {¶ 28} William argues that his counsel made "no attempt to suppress or limit the use of the 911 tape as evidence. Counsel made no objection to the State characterization of Barbara Givens as a liar. This, combined with the unwillingness of Givens' counsel to develop Givens' theory of his case, and, because Givens' counsel was seemingly not adequately prepared to question witnesses at trial, indicates he was not an effective counsel for Givens."
 {¶ 29} Failure to object to the admission of the 911 tape, which did not meet any exception to the hearsay rule, and failure to object to the prosecutor's improper expression of his opinion regarding Barbara's credibility, which exceeded the normal latitude allowed in closing argument, fell below an objective standard of reasonable representation. William, however, was not prejudiced by his counsel's performance; he was found not guilty of the charges relating to Mindy, and absent the remarks made in closing, there is not a reasonable probability that William would have been found not guilty of the charges relating to Barbara, given the testimony of *Page 10 
the several officers at the scene who observed the criminal conduct. William's third assignment of error is overruled.
 {¶ 30} William's fourth assignment of error is as follows: "THE EVIDENCE PRESENTED BY THE STATE DOES NOT SUPPORT GIVENS' CONVICTION.
 {¶ 31} "A. THE EVIDENCE PRESENTED IS INSUFFICIENT TO SUPPORT GIVENS' CONVICTION.
 {¶ 32} "B. GIVENS' CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 33} "In reviewing a claim of insufficient evidence,[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. McKnight, 107 Ohio St.3d 101, 112, 837 N.E.2d 315,2005-Ohio-6046 (Internal citations omitted).
 {¶ 34} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. (Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997,2006-Ohio-3367.
 {¶ 35} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve."State v. DeHass (1997), 10 Ohio St.2d 230, *Page 11 
231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 36} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 37} William was convicted of kidnaping, in violation of O.R.C.2905.01(A)(1), which provides, "No person, by force, threat, or deception, * * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes * * * to hold for ransom, or as a shield or hostage." William was also convicted of abduction, in violation of O.R.C. 2905.02(A)(2), which provides, "No person, without privilege to do so, shall knowingly * * * [b]y force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear."
 {¶ 38} William argues that the "State presented no evidence that Givens was restraining the liberty of Barbara Givens against her will." After reviewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of kidnaping and abduction proven beyond a reasonable doubt. Further, having reviewed all of the evidence and all the reasonable inferences, and *Page 12 
considered the credibility of the witnesses, we cannot conclude that the factfinder lost its way and created such a manifest miscarriage of justice such that William's convictions must be reversed and a new trial ordered. Four officers testified that they witnessed William "grab" Barbara and hold a knife to her throat, positioning her such that her body could serve as a shield, and Sergeant Tate testified that he forcibly removed Barbara from William's grasp. There were guns directed at William and Barbara, creating a further risk of physical harm. It was for the jury to determine the credibility of the officers and Barbara as to whether Barbara's liberty was forcibly restrained, and it is not patently apparent that they lost their way in convicting William of kidnaping and abduction. Since there was sufficient evidence in the record to support the jury's verdict, and since the verdict is not against the manifest weight of the evidence, William's fourth assignment of error is overruled.
 {¶ 39} Judgment will be affirmed.
 BROGAN, J. and FAIN, J., concur. *Page 1