OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Billy R. Reynolds, filed November 16, 2006. On July 20, 2006, Reynolds was indicted on one count of theft of an elderly person or disabled adult, in violation of R.C. 2913.02(A)(1). Following a court-ordered *Page 2 
mental evaluation, Reynolds was found competent to stand trial. On October 17, 2006, a jury found Reynolds guilty as charged in the indictment.
 {¶ 2} The events giving rise to this matter began on June 22, 2006, when Reynolds snatched the purse of the victim, Naomi Shields, as she wheeled herself in a wheelchair to a drugstore to fill her prescriptions. When Shields yelled for help, Mark Pugh, who was nearby, responded by chasing Reynolds and retrieving Shields' purse from him. Shields' wallet was missing. Reynolds then fled on a bike.
 {¶ 3} Reynolds asserts three assignments of error. Reynolds' first assignment of error is as follows:
 {¶ 4} "THE CONVICTION SHOULD BE REVERSED BECAUSE THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
 {¶ 5} We note initially that, in the body of Reynolds' first assignment of error, he argues that "a review of the entire record indicates that insufficient evidence was presented from which the jury could determine Appellant was guilty." The standards of review for arguments that a conviction is not supported by sufficient evidence and is against the manifest weight of the evidence are separate and distinct. Since Reynolds makes both arguments in his first assignment of error, we will analyze his first assignment of error pursuant to both standards.
 {¶ 6} "When an appellate court analyzes a conviction under the manifest weight of the evidence standard it must review the entire record, weigh all of the evidence and all the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Page 3 
(Internal citations omitted). Only in exceptional cases, where the evidence `weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." State v. Dossett, Montgomery App. No. 20997, 2006-Ohio-3367.
 {¶ 7} "The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts to resolve."State v. DeHass (1997), 10 Ohio St.2d 230, 231, 227 N.E.2d 212. "Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness."State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288.
 {¶ 8} This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict.State v. Bradley (Oct. 24, 1997), Champaign App. No. 97-CA-03.
 {¶ 9} "In reviewing a claim of insufficient evidence,[t]he relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. McKnight, 107 Ohio St.3d 101, 112, 837 N.E.2d 315,2005-Ohio-6046 (Internal citations omitted).
 {¶ 10} The State responds to Reynolds' arguments that it "presented the testimony of two eye witnesses that positively identified Reynolds as the mugger. Both witnesses observed *Page 4 
the incident and both witnesses were in close proximity to Reynolds."
 {¶ 11} At trial, Sheilds, Pugh and Allen P. Schroeder, an officer with the City of Dayton Police Department who responded to the scene, testified. Having reviewed the entire record, it is clear that the factfinder did not lose its way and create such a manifest miscarriage of justice that a new trial for Reynolds is warranted. Sheilds testified that she saw Reynolds' face when he snatched her purse. Sheilds identified Reynolds in a photo spread after the incident, she identified him at the preliminary hearing and she identified him in court as the person who snatched her purse. Pugh testified that he heard Sheilds yell for help and he observed Reynolds trying to pull a purse from Sheilds' arms. When he caught Reynolds, Pugh got a good look at his face. Pugh also identified Reynolds in a photo spread and in court as the man who snatched Sheilds' purse. Since the evidence herein does not weigh heavily against Reynolds' conviction, Reynolds' first assignment of error is overruled.
 {¶ 12} Reynolds' second assignment of error is as follows:
 {¶ 13} "APPELLANT ASSERTS INEFFECTIVE ASSISTANCE OF COUNSEL"
 {¶ 14} In determining whether a defendant has received the effective assistance of trial counsel, we apply the standards set forth inStrickland v. Washington (1984), 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id., at 686. "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction * * * has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that *Page 5 
counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction * * * resulted from a breakdown in the adversary process that renders the result unreliable." Id., at 687.
 {¶ 15} "The Ohio Supreme Court has enunciated a similar test for determining claims for ineffective assistance of counsel:
 {¶ 16} "2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (Internal citations omitted).
 {¶ 17} "3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. (Internal citations omitted).
 {¶ 18} "In Strickland, supra, the Supreme Court instructed:
 {¶ 19} "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (Internal citations omitted). A fair assessment of attorney performance requires that every effort *Page 6 
be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel `s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' (Internal citations omitted). There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." (Internal citations omitted). State v. Lloyd (March 31, 1999), Montgomery App. No. 15927.
 {¶ 20} "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.
 {¶ 21} "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the *Page 7 
circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Strickland, supra, at 689-690.
 {¶ 22} Reynolds argues that his counsel was ineffective for failing to "bring forth a witness with exculpatory testimony." According to Reynolds, his counsel should have called Marie Poeffenberger, who was with Sheilds at the time of the offense, as Poeffenberger would have purportedly testified that the perpetrator of the theft had a tattoo on his back. Reynolds argues that, since he does not have a tattoo, this testimony would have proven his innocence. We disagree. Sheilds and Pugh identified Reynolds as the perpetrator, and Sheilds specifically testified that she did not observe a tattoo on Reynolds' back. Further, defense counsel's witness list included Poeffenberger, indicating that counsel was aware of Poeffenberger but, as a matter of trial strategy, chose not to call her, a decision well within the wide range of professionally competent assistance. Since the outcome of the trial would not have been different had Reynolds called Poeffenberger, Reynolds' second assignment of error is overruled.
 {¶ 23} Reynolds' third assignment of error is as follows:
 {¶ 24} "THE TRIAL COURT DID NOT CLEARLY EXPLAIN TO THE DEFENDANT THE CONSTITUTIONAL RIGHTS HE WOULD BE GIVING UP IF [HE] ENTERED A CHANGE OF PLEA."
 {¶ 25} On November 15, 2006, in a companion case (T.C. No. 06 CR 4030; CA NO. *Page 8 
21902), not consolidated on appeal, Reynolds entered a plea of no contest to one count of abusing harmful intoxicants, a fifth degree felony due to prior drug abuse offense convictions. Reynolds appealed his conviction. Reynolds argues herein that the trial court violated Crim.R. 11(C)(2), and the State argues, and we agree, that "it is reasonably apparent that Reynolds' third assignment of error should have been addressed in his other appeal." The State goes on to address the merits of Reynolds' third assignment of error, as will we.
 {¶ 26} "Ohio Crim.R.11(C) was adopted in order to facilitate a more accurate determination of the voluntariness of a defendant's plea by ensuring an adequate record for review. (Internal citation omitted). * * * The United States Supreme Court held * * * that in order for a reviewing court to determine whether a guilty plea was voluntary, the United States Constitution requires the record to show that the defendant voluntarily and knowingly waived his constitutional rights. The court specified these rights as (1) the Fifth Amendment privilege against compulsory self-incrimination, (2) the right to trial by jury, and (3) the right to confront one's accusers." State v. Nero (1990), 56 Ohio St.3d 106,107, 564 N.E.2d 474. Specifically, Crim.R.11(C)(2) provides that, prior to accepting a plea of guilty or no contest, the trial court must address the defendant personally and inform the defendant and determine that the defendant "understands that by the plea the defendant is waiving the rights to jury trial, to confront witnesses against him or her, to have compulsory process for obtaining witnesses in the defendant's favor, and to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself."
 {¶ 27} While literal compliance with Crim.R.11 is the preferred practice, if the reviewing court determines that there was "substantial compliance," the defendant's plea need *Page 9 
not be vacated. Nero. "Substantial compliance means that under the totality of the circumstances the defendant subj ectively understands the implications of his plea and the rights he is waiving. (Internal citation omitted). Furthermore, a defendant who challenges his guilty plea on the basis that it was not knowingly, intelligently, and voluntarily made must show a prejudicial effect. (Internal citation omitted). The test is whether the plea would have otherwise been made." Id.
 {¶ 28} Reynolds argues that "it is not clear as to what the Defendant understood * * * and the constitutional right with strict, scrupulous adherence of Criminal Rule 11 was not met. The Defendant never indicated that he understood his rights and was willing to waive them. In fact, the Defendant through counsel advances that he did not understand that he was waiving all the rights to which he was previously afforded in the previous trial."
 {¶ 29} When Reynolds entered his plea, the following colloquy occurred:
 {¶ 30} "Court: * * * Do you understand that by pleading no contest you give up your right to a jury trial? Understand that?
 {¶ 31} "Reynolds: Yes, I know * * *
 {¶ 32} "* * *
 {¶ 33} "Court: When you give up that right you give up other rights including the right to confront, * * * face witnesses against you, the right to subpoena witnesses on your behalf to attend and testify, the right to require the State to prove your [sic] guilty beyond a reasonable doubt and the right to remain silent. You understand you give up all those rights?
 {¶ 34} "Reynolds: Well, yes I understand that I pled, pled, * * * go ahead, yes.
 {¶ 35} "Court: Yeah, cause you pled guilty before haven't you? *Page 10 
 {¶ 36} "Reynolds: No I never pled guilty. I pled no contest.
 {¶ 37} "Court: Oh, that's what I mean. You've pled * * *
 {¶ 38} "Reynolds: You try to say I, do you plead guilty? I plead no contest.
 {¶ 39} "Court: Right. But that's what I said. You're pleading no contest but you understand even with pleading no contest you give up all that? All those rights?
 {¶ 40} "Reynolds: Inaudible response.
 {¶ 41} "Court: Okay. You're giving up your right to a trial and everything that goes with it?
 {¶ 42} "Reynolds: Yes."
 {¶ 43} Reynolds then pled no contest following the State's recitation of the facts as set forth in the indictment.
 {¶ 44} Having reviewed the above colloquy, we find that, under the totality of the circumstances, there was substantial compliance with Crim.R. 11(C). While the trial court did tell Reynolds that he was giving up his "right to a trial and everything that goes with it," the trial court separately enumerated the rights being waived early in the colloquy before acceptance of the plea. While one of Reynolds' responses was inaudible, we have viewed the tape and there is nothing therein to suggest that Reynolds did not understand what he was being asked. In response to the question Reynolds nodded in the affirmative, and the entire record supports the conclusion that Reynolds' plea was knowing and voluntary. Clearly, Reynolds' responses indicate he understood the rights he was waiving, as enumerated by the trial court, thus Reynolds suffered no prejudice. Reynolds' third assignment of error is overruled. Judgment affirmed. *Page 11 
 WOLFF, P.J. and BROGAN, J., concur. *Page 1